**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **1:17CR270-LMB** |
| | ) | |
| **RAMY SAID ZAMZAM,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## RAMY ZAMZAM'S POSITION ON SENTENCING

Ramy Zamzam's case is a story of redemption and a man's indomitable spirit. For thirteen years in Pakistan Ramy was brutally tortured, but he was never broken; his world was clipped, but his hope still fluttered. Ramy was lost – in so many ways. Now he is grounded. Without pity or fanfare, Ramy is home. Finally. As both the government and defense agree, home is where Ramy Zamzam should remain.

## PRESENTENCE REPORT

Ramy Zamzam has reviewed the presentence report and has the following corrections/objections:

- Mr. Zamzam has never used any of the aliases mentioned on page 2.

- Standard condition number 8 (p. 26) -  Mr. Zamzam asks that he be able to associate with his brother who has a felony conviction from years ago. He had not seen his brother in 13 years prior to his return home, and has been reconnecting with him after so much time lost. Mr. Zamzam currently lives with his brother (for the past almost year) and it has not caused any issues.

- Standard condition number 12 - Mr. Zamzam objects to the condition as worded because it is vague, without any real limitations on what could trigger a notification requirement and who would have to be notified. It therefore provides inadequate notices and improperly delegates to the probation officer authority that rests with the Court. *See, e.g., United States v. Shiraz*, 784 F. App'x 141, 143-44 (4th Cir. 2019) (court's delegation to probation officer of what type of business defendant could operate was improper).

- Special condition number 1 - Mr. Zamzam submits that the term terrorists or terrorist organizations is vague and therefore provides inadequate notice.

- Special condition number 2 is unnecessary given that Mr. Zamzam is already engaged in therapy on his own and is doing well.

- Special condition number 3 is not reasonably related to Mr. Zamzam's offense and is a greater restriction than is reasonably necessary as Mr. Zamzam's involvement did not include any of the online communications with the recruiter, or on the related YouTube postings. If the Court deems monitoring necessary, Mr. Zamzam asks that it exclude computers that he uses for work as this could significantly impact his ability to get employment if his employer were to be required to install monitoring software, and in any event, he is only allowed to use those computers for work purposes. The provision on notifying others is also vague, over broad, improper delegation, and not narrowly tailored/related to any offense conduct.

## BACKGROUND

Mr. Zamzam was born in Egypt and raised in the United States. By all accounts he was smart, athletic, and kind. He excelled in any context. He had a close group of supportive friends, wholesome hobbies, and a remarkable work ethic. Ramy graduated Magna Cum Laude from Howard University with a Bachelors of Science in biology and chemistry and then went on to attend Howard University on a full scholarship to become a dentist. That is why, at age 22, when he and four others went missing in December 2009, leaving behind a video describing a desire to engage in physical jihad in Afghanistan, those in his orbit were shocked.



Ramy (pictured with his mother and father) in dental school

Their parents alerted the FBI, the young men were located in Pakistan, and the five were swiftly captured and beaten. Pakistani law enforcement locked them away in several remote prisons where each of the young men suffered various forms of torture for the next thirteen years.

The initial prison where Mr. Zamzam was held is believed to be secret detention center run by a Pakistani intelligence agency. Mr. Zamzam was held in solitary confinement there for approximately 25 days. His cold, damp, and dark cell contained a blanket on a concrete floor where he slept among dirt and creatures. A surveillance camera was on him at all times except when he was removed from his cell for beatings. He would be blindfolded and beaten by several men, sometimes with objects such a bat. Then, severely wounded and bleeding, he would return to his cell to hear the sound of his friends' beatings and their post-blow suffering.

Mr. Zamzam's captors would torture him mentally as well, stating that they would kill him, that no one knew where he was, and no one would ever find him. They threatened to pull out all his fingernails and attack him with dogs. Food was

barely edible. Water was dirty and caused severe stomach and intestinal issues which Mr. Zamzam continues to suffer from to this day.

After 25 days in this facility, Mr. Zamzam was moved to a local jail where he suffered beatings less frequently, but was still beaten, and Pakistani terrorism charges were brought against him. Mr. Zamzam's parents were allowed to visit him one time there. They came because, although Mr. Zamzam did not know this, his father was dying and he wanted to see his son one last time. Mr. Zamzam later learned from a U.S. Embassy Official that his father had passed away. While at this local jail, Mr. Zamzam and his friends were convicted under questionable circumstances and sentenced to ten years.

Mr. Zamzam began serving his sentence in Faisalabad Central jail where he spent five years mostly in complete solitary confinement. Only occasionally during the five-year period was he able to walk around outside of his cell, read anything, or interact with anyone. He was beaten at this jail as well and these beatings were unpredictable. The jail officials expected bribes, but sometimes that made one more susceptible to being beaten. It was a no-win situation in which Mr. Zamzam was helpless.

Mr. Zamzam often lacked basic toiletries, was consistently hungry, and continued to experience severe intestinal issues as a result of unsanitary conditions and dirty water. At one point, Mr. Zamzam experienced abdominal pain so severely that he was finally able to convince the jail officials to provide him with medical attention at which point doctors discovered he had appendicitis and performed an

emergency appendectomy. Mr. Zamzam engaged in a hunger strike a few times
when the conditions became so bad that it was unbearable. This would result in a
temporary change in conditions, but only briefly.

It was at this prison where Mr. Zamzam's friend and co-defendant, Aman
Yemer, began his rapid decline. On the rare occasions when Mr. Zamzam saw his
friend, Mr. Yemer was incoherent or nonresponsive. He saw Mr. Yemer getting
beaten in that state. This is consistent with what has been reported regarding the
Faisalabad police as well. *See* Justice Project Pakistan & Allard K. Lowenstein
International Human Rights Clinic Yale Law School, *Policing as Torture: A Report
on Systematic Brutality and Torture by the Police in Faisalabad, Pakistan*, p. 9
(2014)("In addition to directly torturing the victims, the Faisalabad police also
forced 464 detainees to witness the torture of their friends, family members, or
other prisoners.").[1] Mr. Zamzam believes that eventually the authorities simply
drugged Mr. Yemer with sleeping pills during most of this period.

After approximately five years at this facility, Mr. Zamzam and the others
were moved to Sahiwal prison which Mr. Zamzam describes as the worst of the
worst. This was a relatively new high-security prison so expansive that it allowed
the authorities to maximize isolation such that Mr. Zamzam could not even *hear*
another human being in his solitary confinement. In the four years he was
imprisoned there, Mr. Zamzam was allowed out of his cell to walk only one hour per

---

[1] Available at
https://law.yale.edu/sites/default/files/documents/pdf/JPP_Launch_Report_050514.p
df

day for about nine months. His only interaction with others was when he was beaten, and for a few days when he and his co-defendants were randomly put in cells next to each other. Otherwise, he was alone in a silent space, in a filthy cell among insects and rodents, with little to eat and contaminated water.

Mr. Zamzam's captors forced him to wear fetters, or fetter-like devices, for 3-month stretches. Fetters are leg irons that are widely outlawed and considered torture. *See* Def.'s Ex. 3, Amnesty International, *"Keep Your Fetters Bright and Polished" The continued Use of Bar Fetters and Cross Fetters* May 1, 1995.[2] The devices include a long metal rod between the legs to restrict movement. While chained in these fetters, Mr. Zamzam had to hoist the center bar to walk, but because the bar is also short, walking could only be achieved while hunched over. Sleeping in the leg irons was physically excruciating because the rod is positioned in a way that causes the legs to contort while lying down. Individuals in fetters often cannot properly use the bathroom because clothes cannot be removed. In Mr. Zamzam's case, sharp screws donned inside of the rings around his ankles, causing cuts and bleeding any time he moved. *See id.* ("[A former Pakistani prisoner] described the fetters as 'unpolished, with rough sharp edges' which rub the ankles sore and rupture the skin.")(citation omitted). If Mr. Zamzam was moved from one location to another, a hood was placed over his head. He again engaged in a few hunger strikes with little results. The officials there did everything they could get away with to break him, both mentally and physically.

---

[2] Available at https://www.amnesty.org/en/documents/asa33/012/1995/en/

Indeed, the abuses by Pakistani authorities in this context have been well documented. "Human Rights Watch has long documented the widespread use of torture and other ill-treatment by the Pakistani police during criminal investigations. Criminal suspects from marginalized groups are at particular risk of police abuse. Methods of torture include beatings with batons and *littars* (leather straps), stretching and crushing legs with *roola* (metal rods), sexual violence, prolonged sleep deprivation, and causing severe mental anguish, including by forcing detainees to watch other people being tortured." *Pakistan: Make Torture a Crime*, Human Rights Watch (August 23, 2022);[3] *see also Torture in Pakistan*, Asian Human Rights Commission ("In spite of the prohibition of torture in the constitution, the Pakistan Army is running detention and torture cells in almost every city in the country. The Asian Human Rights Commission in a report has identified 52 such detention centres which are run by the military, where people who were arrested and disappeared are kept incommunicado and tortured for several months to extract the confession statements.").[4]

When Mr. Zamzam's sentence had finally run, he was moved from this prison to a detention facility for foreigners where he was no longer beaten or in solitary confinement. He reunited with co-defendants, Mr. Mini and Mr. Yemer. There, he found that Mr. Yemer was now so broken he was simply a shell of the friend he once was. During the two and a half years that the three of them spent waiting for their

---

[3] Available at https://www.hrw.org/news/2022/08/23/pakistan-make-torture-crime
[4] Available at http://www.humanrights.asia/tortures/torture-in-pakistan/

repatriation, Mr. Zamzam and Mr. Mini spoon-fed Mr. Yemer who could no longer feed himself, they dressed him, walked him from place to place, and even changed and cleaned his soiled clothes when Mr. Yemer went to the bathroom on himself, as he was now unable to control even these bodily functions. Mr. Zamzam begged authorities to help treat Mr. Yemer, but his pleas fell flat. Finally, almost 13 years after their departure from the United States, and 3 years in excess of their Pakistani sentence, Mr. Zamzam was released to the custody of the FBI and returned home to face these criminal charges.

## ARGUMENT

### I.   Legal Standard

Since the Guidelines were held to be advisory in *United States v. Booker*, 543 U.S. 220, 226 (2005), imposing a sentence is no longer a strictly mathematical exercise. While "a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines," *United States v. Hughes*, 401 F.3d 540, 546 (4th. Cir. 2005), district courts must now make "an individualized assessment based on the facts presented" after calculating the advisory Guidelines range. *Gall v. United States*, 552 U.S. 38, 50 (2007). The Guidelines range is but one of several factors a court must consider when imposing a sentence and it is legal error to treat those ranges as default sentences. *See United States v. Mendoza-Mendoza*, 597 F.3d 212, 216-17 (4th Cir. 2010); *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam); *Spears v. United States*, 555 U.S. 261, 263-64 (2009). A court must also weigh the factors enumerated in 18 U.S.C. § 3553(a) when imposing

a sentence.

Taking into account the factors enumerated in § 3553(a), which state that a judge must "impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)), courts are not required to point to "'extraordinary' circumstances to justify a sentence outside the Guideline range." *Gall v. United States*, 552 U.S. 38, 47 (2007). A below-Guidelines sentence may be appropriate if the Court determines that the Guideline sentence "falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, perhaps because the Guidelines . . . fails to properly reflect § 3553(a) factors." *Rita v. United States*, 551 U.S. 338, 351 (2007)(citation omitted).

The factors for the district court to consider include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the kinds of sentences available, (3) the Guidelines range, (4) the need to avoid unwarranted sentencing disparities, (5) the need for restitution, and (6) the need for the sentence to reflect: the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to the defendant and others, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. See 18 U.S.C. § 3553(a). The Court must weigh each of these factors when determining the appropriate sentence with the least amount of imprisonment necessary pursuant to §3553(a). *Id.*

## II.     A sentenced of time-served is sufficient but not greater than necessary to achieve the goals of sentencing.

To say that Mr. Zamzam has already been punished for his offense would be an understatement. To say that he steadily persevered with gratitude and positivity would be the same. Both the government and defense agree that no further incarceration is warranted. For the reasons detailed below, the Court should likewise sanction this agreed resolution.

### A.     *Mr. Zamzam's offense was a brief aberration from his otherwise outstanding history and character.*

For an individual who spent thirteen years being tortured in a Pakistani prison, it would be easy to return home wallowing in self-pity and excuses. Yet, true to his character, Mr. Zamzam did exactly the opposite. He did not let his thirteen years of torture break him. He persevered through his darkest days abroad and deftly navigated his disorienting return to a changed world. One of the first actions he took was to start volunteering at a local food pantry. Then, within ten days of returning, he had his first job. He quickly reconnected with his friends and family, reinitiated his education, and became a valued employee (and promoted) at more than one—indeed, four, jobs. He currently works as technical support at a technology company, in the customer service dept at a home improvement company, and at a few restaurant jobs part time.

Ramy is also pursuing educational goals, specifically a masters' degree in business administration followed by a masters' degree in information technology. He has confirmed that he meets all of the requirements for both of these programs.

He also plans to apply to the International Relations PhD program at American University. These educational endeavors are not simply theoretical ideas. Mr. Zamzam has taken concrete steps to begin this process, delaying his start only through the pendency of this case. To that end, Mr. Zamzam has: acquired necessary official transcripts; collected letters of recommendation; and discussed academic and admission requirements with three different academic advisors at the university. He has also visited American University's campus and discussed the admissions process with faculty there and corresponded with them online as well. He currently meets the requirements except for having a GRE score, so he is currently studying to take the GRE.

Ramy lives with his two brothers and mother. Far from feeling constrained in their small apartment, he relishes the time he now has with them, having missed so much. Knowing that life is short, having already lost his father, Ramy spends as much free time as he can with his family, just enjoying the mere fact of being in their presence – something he will never again take for granted.



Ramy and his mother on his first day of freedom



visiting his father's grave



Just days after returning home after thirteen years in a Pakistani prison, Ramy Zamzam hits the ground running, interviewing for jobs and exploring educational opportunities.

Also of note is Ramy's exceptional performance on pretrial release. Any requirement or task that is asked of him, he completes with genuine purpose and a quiet diligence. Ramy has achieved all of these recent endeavors, and still carries himself, with unwavering grace and gratitude for the mere fact of being free.

Others have attested to his high character, dedication to his family, and strong work ethic as well.

His younger brother wrote:

> Since childhood, Ramy has been an exceptional mentor and someone who to this day continues to inspire me. His friendly and compassionate demeanor has always resonated with those around him. He effortlessly exudes kindness and respect towards others, traits that have earned him admiration and appreciation from friends, colleagues, and acquaintances alike.

Def.'s Ex. 2.

Mr. Zamzam's mother wrote to the court about his demeanor and dedication to his community.  She wrote:

> Ramy has also been very active in his professional life as well as extra-curricular activities. He works a full time job as well as a few part time ones and his excelling in the workplace and has recently received a promotion. In addition, upon his return he immediately started volunteering regularly at a local food pantry and has built a very strong relation with the Church and community leaders that help manage it.

*Id.*

His partner, Hana Abdulhakim, wrote of how supportive he is as a partner for her career and their plans for a future together:

> In addition, he is an inspiration for all those around him, including myself. His ambition to work hard and dream big is contagious. We have both made plans to continue our education together. He has been very supportive of me in my desire to build my career as he continues to work extremely hard to build his. I am greatly proud of the efforts he is making to establish himself and secure his future success. Ramy is full of aspirations and without a doubt, he will be successful in his future endeavors and will continue to be an upstanding member of society.

Lastly, his brother, Mahmoud, wrote of his kind heart and mentorship from an early age:

> His commitment to his exceptional ethic has been a light in many people's lives. To be driven is one thing, but to use that immense effort on the behalf of others is what drives us to loving him. Even before I knew the world, I knew he cared for it and the people in it. Anyone who gets to known even a little bit about him would pick this up. His genuine character sits at the front of all his interactions, and I believe is one of the reasons he can connect and impact those around him with such a light.

*Id.*

>   B.    *Nature and circumstance of the offense*

The nature and circumstances of Ramy's offense are straightforward. A group of Ramy's friends approached him with their plans of fighting against U.S. and allied forces abroad in Afghanistan and Ramy, after taking some time to research and consider it, agreed to join them. As with most of his endeavors, Ramy then emersed himself in this short-lived pursuit, even helping to create a video that would be left behind explaining their cause. He has an acute awareness of his wrongdoing and, understandably, now a profound appreciation for this country. *See* Def.'s Ex. 1.

>   C.    *The Guidelines range is not rooted in empirical evidence and artificially increases Mr. Zamzam's criminal history category.*

"[The terrorism] guideline was enacted pursuant to a congressional directive and absent empirical evidence. Such guidelines do not exemplify the Sentencing Commission's exercise of its characteristic institutional role and are generally entitled to less respect." *United States v. Dais*, 482 F. Supp. 3d 800, 803 (E.D. Wis. 2020)(citing *Kimbrough v. United States*, 552 U.S. 85, 109 (2007); *United States v. Reyes-Hernandez*, 624 F.3d 405, 418 (7th Cir. 2010); *United States v. Alhaggagi*, 372 F. Supp. 3d 1005, 1014 (N.D. Cal. 2019)(rev'd on other grounds)).  In fact, this Court has noted this lack of empirical basis as well, stating "The guidelines are not based on any empirical research. There has been no study to determine how much time a terrorist should have…" Hon. Gerald Bruce Lee, Symposium, *Convicted Terrorists: Sentencing Considerations and Their Policy Implications*, 8 J. Nat'l Security L. & Pol'y 347, 361 (2016). As such, this Court should give little, if any, weight to the

advisory Guidelines range.

Not only is the terrorism guideline itself unsupported by empirical data, the terrorism guideline is "contrary to the theory behind the guidelines: that the offense level will reflect the seriousness of the offense, increasing incrementally based on specific aggravating facts, and the criminal history category will reflect the risk to the public, based on the defendant's prior record….Terrorism cases are undoubtedly serious, but automatically increasing a defendant's criminal history to reflect the seriousness of the charged offense seems misguided." *Dais*, 482 F. Supp. 3d at 803 (internal citations omitted).

As the court explained in *Alhaggagi*, 372 F. Supp. 3d at 1013 the *offense level* reflects the seriousness of the charged conduct. "A defendant's *criminal history category* reflects something different." *Id.* (citing *United States v. Martinez*, 931 F.2d 851, 852 n.1 (11th Cir. 1991) ("the distinction between the calculation of the offense level and the calculation of the criminal history category is important insofar as 'each calculation concerns a conceptually separate notion related to sentencing.'") (quoting *United States v. Goolsby*, 908 F.2d 861, 863 (11th Cir. 1990)(emphasis in original)).

Absent the terrorism enhancement, Mr. Zamzam would have a criminal history score of zero, reflecting his otherwise entirely law-abiding life. Treating him as though he were a career criminal because of his offense is "illogical and unjust." *Alhaggagi*, 372 F. Supp. 3d at 1016. Therefore, because the guidelines are not rooted in an empirical evidence and because Mr. Zamzam's criminal history score is

artificially inflated with no sound basis, the Court should give little weight to the guidelines range.

D.     *A sentence of time-served adequately reflects the seriousness of the offense, promotes respect for the law, provides just punishment and deterrence.*

There can be no question that Mr. Zamzam has already been punished severely. In fact his punishment has been so severe that it transcended domestic and international standards. In that sense, Mr. Zamzam's experience has far exceeded what could be considered just punishment—it was draconian and cruel.

Moreover, the goal of rehabilitation and deterrence has already been achieved. Ramy's perspective has completely transformed after 9 years of solitary confinement, routine beatings, and watching his friend's life all but slip away knowing that he should have, and maybe could have, talked them all out of this horrific plan. Ramy is so grateful just to sit in the sunshine or alongside his mother, that he asks for little else. He has experienced the horrors of another life. He has no plans, and no desire, to veer from this positive existence he is finally rebuilding. Ramy has proven himself to be responsible, sincere, and productive.

This has been confirmed by forensic evaluation as well. After interviewing Mr. Zamzam, performing a series of examinations, reviewing case evidence, and speaking with Mr. Zamzam's family, the licensed clinical psychologist wrote, "By all accounts, Mr. Zamzam presents with almost none of the historical or clinical factors associated with an increased level of violence risk or criminal recidivism… He expresses remorse for his actions in the instant offense, as well as worry about the

negative consequences that he and others have experienced as a result. All available information suggests that he is similar in most relevant respects to offenders who present with little risk for recidivism, violence, or supervision failure." *See* PSR, ECF No. 134-3 at 12-13. Not only is Mr. Zamzam a low risk for reoffending, but sending him to prison at this point could cause both him and society greater harm. The expert psychologist opines that "[a]ll available information suggests that he is more likely to benefit from treatment than from further incarceration. In fact, a more lengthy period of incarceration only increases the probability that he will be re-traumatized and that his significant progress with be derailed." *Id.* at 13.

## CONCLUSION

Mr. Zamzam has been severely punished for his actions beyond all reasonable measure. He has somehow managed to remain steadfastly positive, productive, and grateful. He is finally home, and as the government and defense agree, home is where Mr. Zamzam should remain. He asks this Honorable Court to impose time-served and supervised release.

Respectfully submitted,
RAMY SAID ZAMZAM
By Counsel

_____/s/_____
Jessica N. Carmichael, Esq., VSB #78339
CARMICHAEL ELLIS & BROCK, PLLC
108 N. Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 684-7908
jessica@carmichaellegal.com

## **CERTIFICATE OF SERVICE**

     I hereby certify that on this 25th day of July, 2023, I filed the foregoing pleading through the ECF system, which shall then send an electronic copy of this pleading to all parties in this action.


_____/s/_____
Jessica N. Carmichael, Esq.